UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **BANXCORP,** | Civil Action No. |
| Plaintiff, | |
| | **COMPLAINT** |
| v. | |
| | **JURY TRIAL DEMANDED** |
| **LENDINGTREE LLC,** | |
| Defendant | |

Plaintiff, BanxCorp a/k/a BanxQuote ("BANXCORP", "BanxQuote," "*BanxQuote.com*" or Plaintiff), by and through its attorneys, CANTER LAW FIRM P.C., files this Complaint against LendingTree LLC ("LendingTree" or "Defendant"), for antitrust violations pursuant to Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1), and the New Jersey Antitrust Act, stating as follows:

## PARTIES

1.   Plaintiff BANXCORP is a Delaware corporation, with its principal place of business at 153 S. Morris Lane, Scarsdale, New York.  From its inception in 1984 until the present, Plaintiff has done business under the trade name and registered trademark BanxQuote. BANXCORP owns and operates *BanxQuote.com*, consisting of an Internet-based consumer banking marketplace, also referred to simply as a bank rate website ("Bank Rate Website") that provides fee-based aggregated bank rate table listings with interactive functionalities.

2. Defendant LendingTree LLC is a Delaware limited liability company with its principal place of business at 11115 Rushmore Drive, Charlotte, North Carolina, which does business throughout the United States and offers, or had offered within the past four years or longer, a Bank Rate Website at *LendingTree.com*, including within the State of New Jersey.

## JURISDICTION AND VENUE

3. The jurisdiction of this Court is invoked pursuant to 15 U.S.C. § 1, § 26 and 28 U.S.C. § 1331, § 1337, § 1367.

4. This Court has proper venue pursuant to 28 U.S.C. § 1391 (b) and (c) and 15 U.S.C. §§ 15 and 22 because Defendant has transacted a substantial amount of business in the state, the conduct complained of herein occurred in part in the state, harm caused by the anticompetitive conduct has occurred within the state.

## PRELIMINARY STATEMENT

5. Upon information and belief, Defendant has engaged in an unlawful *per se* horizontal market division and customer allocation agreement, and a *per se* horizontal price fixing agreement with one or more competitors.

6. Upon information and belief, more specifically, Defendant entered into a conspiracy in restraint of trade and formed a cartel with their competitor Bankrate Inc. ("BANKRATE"), which owns and operates a competing Bank Rate Website known as *Bankrate.com*, together with nearly 100 other horizontal competitors including some of the largest media conglomerates in the United States (the "BANKRATE CARTEL"), as

2

more fully set forth in Exhibit I, attached herewith and incorporated herein by reference.[1]

7. Upon information and belief, Defendant has implemented a scheme to illegally leverage the BANKRATE CARTEL's monopoly and market dominance to gain an unfair advantage over Plaintiff and a few other remaining independent competitors in the market or submarket for Bank Rate Websites throughout the United States.

8. The purpose and effect of the BANKRATE CARTEL's dominance and unlawful scheme was to restrain the competitive field in the market or submarket for Bank Rate Websites as more fully set forth below, thereby coercing customers – the banks – to purchase the BANKRATE CARTEL's cost-per-click ("CPC") bank rate listings instead of Plaintiff's, through anticompetitive conduct rather than through competition on the merits. These unequal positions caused extensive damage to the competitive marketplace, to customers – the financial service providers (or direct purchasers), and ultimately to consumers – the end users (or indirect purchasers)

9. Upon information and belief, the damage caused by the BANKRATE CARTEL to Plaintiff exceeds $500,000,000 (Five Hundred Million Dollars), and the harm to the competitive marketplace and consumers is of equal or greater magnitude.

10. This action challenges the unlawful anticompetitive scheme currently employed by Defendant and the BANKRATE CARTEL, collectively, directed at Plaintiff

---

[1] Plaintiff reserves the right to join other co-defendants such as members of the BANKRATE CARTEL in the same or a similar class as Defendant herein.

BANXCORP and any other company that lawfully attempted to compete with Defendant in the market or submarket for Bank Rate Websites.

## RELEVANT PRODUCT MARKET

11. The relevant product market or submarket for purposes of this Complaint is the market for fee-based aggregated bank rate table listings with interactive functionalities on the Internet, often referred to as the "Internet-based consumer banking marketplace," or, simply, bank rate websites ("Bank Rate Websites").

12. The relevant geographic market for Bank Rate Websites is the whole of the United States.

13. For a more detailed analysis of the relevant market, its outer boundaries, functionality, cross-elasticity of demand, substitutability, market structure, industry background and history, see pages 7 through 34 and the Appendix of Exhibit I, and pages 5 through 16 of Exhibit II, attached herewith and incorporated herein by reference.

## THE ANTICOMPETITIVE SCHEME

14. Upon information and belief, Defendant in conjunction with the BANKRATE CARTEL, possessing combined market power in the market for Bank Rate Websites with an approximately 95% market share, (i) have divided markets and allocated customers, (ii) have fixed and are fixing prices, (iii) in parallel, by agreement and concerted action rather than independent action, (iv) acting in a uniform manner, (v) have severely limited and impeded competition in the market for Bank Rate

Websites, (vi) have injured and adversely affected Plaintiff, competition, consumers, and financial service providers as a proximate result of the concerted action, by:

a. Dividing products or markets and allocating customers;

b. Participating in meetings, conversations and communications with competitors to discuss the CPC prices to be charged to financial service providers for listing rates on Bank Rate Websites;

c. Agreeing with competitors at the same level of market structure to charge Bank Rate Website Hyperlink CPC prices at certain levels to be sold to certain financial service providers;

d. Issuing CPC price quotations in accordance with the agreements reached;

e. Agreeing to let BANKRATE sell Bank Rate Website Hyperlinks on behalf of Defendant at CPC prices they knew to be fixed pursuant to the conspiracy described above;

f. Concealing the existence of the conspiracy from consumers and other market participants to allow the continuation of the conspiracy; and

g. Exchanging information with competitor BANKRATE on sales and revenue of Defendant's Bank Rate Website Hyperlinks, for the purpose of reporting and monitoring adherence to the agreed-upon CPC prices and revenue shares.

15. Upon forming the BANKRATE CARTEL, Defendant and BANKRATE introduced an anticompetitive business model whereby they "jointly charged financial

institutions for each instance where a consumer clicks on a hyperlink for a financial institution listed in a rate table."

16.     Defendant competes with each of the other members of the BANKRATE CARTEL for revenue and Internet consumer traffic in the market for Bank Rate Websites or in other markets, and they each were or are actual or potential competitors of BANKRATE and Plaintiff in the market for Bank Rate Websites or in other markets.

17.     BANKRATE repeatedly describes Defendant and the other members of the BANKRATE CARTEL as its partners and competitors in its periodic S.E.C. filings. In fact, BANKRATE's CEO Thomas R. Evans ("Evans") acknowledged in BANKRATE's Q2-2007 Earnings Call, the following:

> *"Some of the guys that are our partners, they're also competitors."*

18.     Once the BANKRATE CARTEL was formed, Defendant and BANKRATE began to share and exchange sensitive sales information through monthly click-through, revenue and market allocation reports, including consumer traffic, and behavioral information of buyers and sellers in Defendant's Bank Rate Website. Consequently, customers – the banks – lost their principal bargaining power.

19.     Upon information and belief, CPC profits were shared approximately on a 50-50 basis between Defendant and BANKRATE, as explicitly acknowledged by Evans during Q2-2006 and Q4-2006 Earnings Call Question-and-Answer Sessions, respectively, as follows:

> **Bankrate Q2 2006 Earnings Call** (August 2, 2006):
>
> **Gary Schnierow - JP Morgan:**

> *Okay and what's the traffic you get from your partners? How does the revenue split on that work?*

**Thomas R. Evans:**

*Yes, generally it goes to those co-brands and we split the revenues 50-50.*

**Bankrate Q4 2006 Earnings Call** (February 6, 2007):

**Thomas R. Evans:**

*Well, most of you know when we talk about our partner traffic, I mean the traffic costs us nothing, but we do rev share with our partners basically 50-50.*

20. Since the intent or predominant effect of the restraint was to prevent independent competition with *Bankrate.com's* own Bank Rate Website at the same level of market structure, the restraint of trade is horizontal in nature and effect.

21. In BANKRATE's Q1-2007 Earnings Call, Evans proudly acknowledged BANKRATE CARTEL's market power and foreclosure of competition as follows:

> *One of the things that is a tremendous gating item for us, we believe is in terms of competition, and barriers for competition, is how does anybody else break into this, if we have tied up all the best newspaper relations, the best co-brand relationships and we've got a dynamic organic traffic website.*
>
> *How does anybody else get into this business and compete with Bankrate? I look at it as both an offensive marketing opportunity, as well as a defensive opportunity.*

22. Thus did BANKRATE pose and answer its rhetorical question of how Defendant and BANKRATE have *jointly* suppressed competition and created sales and price controls, insurmountable restraints and barriers to entry.

23. Furthermore, these practices have neither promoted technological innovation, enhanced efficiency, nor benefited consumers, and were intended to foreclose and have had the effect of foreclosing competition.

## THE ANTICOMPETITIVE EFFECTS

24. Upon information and belief, the BANKRATE CARTEL has abused its market power with the central purpose of unfairly and artificially handicapping the market share of Plaintiff and other competitors in the marketplace, and constrained them from expanding to reach the minimum efficient levels of scale necessary to compete with the BANKRATE CARTEL.

25. With Plaintiff's and other competitors' opportunity to compete thus constrained, the cycle continues, and the BANKRATE CARTEL's monopoly profits continue to flow.

26. The BANKRATE CARTEL has achieved a total relevant market share of approximately 95%, possessing unmistakable and undeniable market power as a result of its antitrust violations.

27. Upon information and belief, not a single economically viable independent competitor is still functioning as a Bank Rate Website with a market share over 5%.

28. Furthermore, the installed infrastructure is extremely expensive to build and it is therefore unlikely that a new entrant will be able to realistically compete and penetrate this market while the BANKRATE CARTEL monopoly remains in effect.

29. Based on its current growth rate and overall market trends, the BANKRATE CARTEL is imminently expected to achieve a 99-100% total market share in the market for Bank Rate Websites.

30. Defendant's and the BANKRATE CARTEL's exclusionary conduct has effectively and unlawfully precluded Plaintiff and other competitors from the market for Bank Rate Websites. The few remaining competitors in the relevant market at the moment are weak and increasingly starved of opportunities to attract meaningful traffic, transaction volume, and revenues.

31. Plaintiff's market share, going concern and fair market values have been destroyed as a result of the BANKRATE CARTEL's and Defendant's unlawful anticompetitive conduct.

32. But for the BANKRATE CARTEL's acts, Plaintiff and others would be able to compete based on competitive merit, bringing lower prices to financial service providers, enhanced technological innovation and greater freedom of choice to both financial service providers and consumers.

33. Defendant's anticompetitive acts had a direct, substantial, and negative effect on trade and commerce, by unlawfully denying rivals a competitive opportunity to achieve minimum levels of efficient scale.

34. The most significant harm to Plaintiff, consumers, financial service providers, and competition are summarized below:

   a. Independent Bank Rate Websites were previously competing primarily on the basis of price, but as a result of Defendant's conspiracy with the

    BANKRATE CARTEL, financial service providers lost their principal bargaining tool.

b. Defendant's periodic CPC price increases, charged to over a thousand participating financial service providers, directly affected and raised each bank's acquisition cost per account and non-interest expense.

c. Banks were inevitably forced to pass on these higher expenses to consumers who visit the BANKRATE CARTEL's Bank Rate Websites, by offering them less favorable interest rates, above or below the rates that likely would prevail in the absence of such cartel, as a result of this umbrella effect.

d. The BANKRATE CARTEL has made it impossible for competing Bank Rate Websites to remain in business or become newly established.

e. By being designed to be overly large, the BANKRATE CARTEL made competition with it uneconomical, if not impossible. In fact, no such competing and economically viable Bank Rate Websites network of a meaningful or comparable scale has ever been able to be launched or established in the United States.

f. Defendant's exclusionary conduct successfully foreclosed and forecloses future entry, prevents or limits rivals from gaining competitive access to potential co-branding partners or customers, and excludes rivals from a significant part of the relevant market.

g. Too much sharing of instantly available information by Defendant and BANKRATE made it very easy for them to engage in market division, customer allocation and price fixing through subtle or not so subtle coordination mechanisms, to the detriment of consumers, financial service providers and any independent competitors everywhere.

h. The BANKRATE CARTEL reduced Defendant's ability or incentive to compete independently, limited independent decision making, and combined the control of or financial interests in production, key assets, or decisions regarding price, input, output, or other competitively sensitive variables.

i. The BANKRATE CARTEL's formation increased its ability to raise its CPC prices more than six consecutive times, each time by 10% to 25%, since October 1, 2005.

j. The ability or incentive to reduce or increase input, output, quality, service, or technological innovation above or below what likely would prevail in the absence of the BANKRATE CARTEL, caused detriment to consumers, financial service providers and competitors everywhere.

k. The collaboration between competitors who are members of the BANKRATE CARTEL facilitated explicit or tacit collusion through practices such as the exchange or disclosure of competitively sensitive information or through increased market concentration.

l. Such collusion involved the relevant market in which the BANKRATE CARTEL currently operates—the market for Bank Rate Websites—and other markets in which the participants in the collaboration are actual or potential competitors.

m. The BANKRATE CARTEL precluded rivals from obtaining the necessary scale needed for efficient or viable levels of operation, raised rivals' operating and marketing costs, inhibited competition and induced competitors' exit.

n. The net anticompetitive effect of the BANKRATE CARTEL's manipulative free rate listings or product dumping was to discourage financial service providers from paying other Bank Rate Websites competitors including Plaintiff for listing their rates and drove competitors out of the market.

o. The net effect of the BANKRATE CARTEL's predatory campaign was to "cut off Plaintiff's and other competitors' air supply" by arbitrarily and selectively giving away free rate listings to financial service providers, and commingling free rate listings with paid rate listings.

p. Defendant's exclusionary practices, combined with the BANKRATE CARTEL's monopoly power, have been used by Defendant as leverage to gain market share, foreclose competition, and potentially extend their dominance beyond the relevant market.

q. In sum, Defendant's anticompetitive actions led to the following:

- higher Bank Rate Websites CPC prices
- less favorable consumer interest rates
- less technological innovation
- less choice
- greater threat to our free market system
- less accountability
- more limited checks and balances
- less protection against price fixing
- less protection against market divisions or customer allocations
- greater risks of market manipulation
- less fairness
- less transparency
- less privacy
- less service

35. The more specific effects of Defendant's price-fixing conspiracy can be summarized as follows:

    a. Several independent pricing voices became a single monopoly pricing voice.

    b. A central sales force was responsible for coordinating pricing, sales, collections and disbursement of respective revenue shares, for the mutual benefit of each member of the BANKRATE CARTEL.

    c. There was a common target price, the CPC.

    d. All sales adhered to a price list or rate card.

    e. Price differentials between different types, sizes, locations, or quantities of products were maintained uniformly.

    f. Payment and credit terms were standardized.

    g. Allowances, discounts and markups were uniformly established.

    h. Input or output were coordinated and purposefully reduced or expanded in order to affect prices.

    i. The price list was not publicly available, another tell-tale sign of price fixing, discrimination and manipulation.

36. Defendant's antitrust violations have caused substantial harm to Plaintiff's business, as follows:

    a. Loss of Market Share and Revenues: Plaintiff's market share and consequential revenues have declined at a rate of approximately 25% annually, year after year, for at least four years.

    b. Higher Operating and Marketing Expenses.

    c. Lost Profits.

    d. Increased Costs of Capital and No Access to Capital Markets.

    e. Severely Contracted Operating Scale, required for Plaintiff to maintain a viable level of operation. Except for a skeleton staff and Plaintiff's two top management employees, who were forced to forgo their own salaries, all other employees were laid off.

      f.   No Longer Viable as a Going Concern, unless Plaintiff's private owner continues to personally finance its unprofitable operations.

37.    Upon information and belief, the BANKRATE CARTEL and Defendant's conduct dealt a fatal blow to any other marginally remaining competitors in the market for Bank Rate Websites, which left the BANKRATE CARTEL in total control of this market.

38.    The negative consequences of the disappearance of Plaintiff as a competitor are substantial, not only to Plaintiff, but to all marketplace participants, consumers and financial service providers as a whole.

39.    If the operation of Bank Rate Websites throughout the United States is exclusively controlled by the unregulated BANKRATE CARTEL, the opportunities for market manipulation and abuse of market power increase tremendously, with potentially catastrophic consequences for the entire United States consumer banking, mortgage and credit markets, and any other related markets, as well as the Nation's economy.

40.    The adverse anticompetitive effects of Defendant's actions are particularly ominous in light of the recent turmoil in the mortgage, credit, and banking markets.

## ANTITRUST STANDING

41.    BANXCORP is a proper party to seek redress under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, because it is a competitor in the relevant market, which has been restrained and monopolized, and BANXCORP has suffered

direct antitrust injury. There is neither a more direct victim, nor one that has been more severely harmed as a result of Defendant's actions, that is likely to seek redress for these violations.

42. There is a direct, causal relationship between the challenged conduct and BANXCORP's injuries, and those injuries are neither tenuous nor speculative. Absent Defendant's anticompetitive scheme to restrain trade, BANXCORP could have increased its size, profitability, market share and market value instead of being driven to its demise.

## EFFECT ON INTERSTATE COMMERCE

43. Defendant's anticompetitive conduct as alleged herein has taken place in interstate commerce among the States and in the market for Bank Rate Websites.

## FIRST CLAIM FOR RELIEF
### (SHERMAN ACT, SECT. 1, 15 U.S.C. § 1)
### CONTRACT, COMBINATION OR CONSPIRACY IN RESTRAINT OF TRADE

44. Plaintiff incorporates all previous paragraphs herein by reference.

45. Defendant has illegally restrained trade in the market for Bank Rate Websites in violation of Section 1 of the Sherman Act by engaging in a *per se* horizontal market division and customer allocation agreement, and a *per se* horizontal price fixing agreement with one or more competitors. More specifically, Defendant entered into a conspiracy in restraint of trade and formed a cartel with their competitor Bankrate Inc., which owns and operates a competing Bank Rate Website known as *Bankrate.com*.

46. Defendant's anticompetitive conduct had a significant adverse effect on competition in the market for Bank Rate Websites, causing direct and proximate harm to customers – the financial service providers (or direct purchasers), and ultimately to consumers – the end users (or indirect purchasers).

47. The anticompetitive actions of Defendant have injured Plaintiff in its business and property.

### SECOND CLAIM FOR RELIEF
### (NEW JERSEY ANTITRUST ACT, N.J STAT. ANN. § 56:9-1 *ET SEQ.*)
### CONTRACTS AND COMBINATIONS IN RESTRAINT OF TRADE

48. Plaintiff incorporates all previous paragraphs herein by reference.

49. Section 56:9-3 of the New Jersey Antitrust Act renders every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade unlawful.

50. Defendant acting jointly with BANKRATE illegally restrained trade in the market for Bank Rate Websites in violation of Section 56:9-3 by engaging in a *per se* horizontal market division and customer allocation agreement, and a *per se* horizontal price fixing agreement with one or more competitors. More specifically, Defendant entered into a conspiracy in restraint of trade and formed a cartel with their competitor Bankrate Inc., which owns and operates a competing Bank Rate Website known as *Bankrate.com*.

51. Defendant's anticompetitive conduct had a significant adverse effect on competition in the market for Bank Rate Websites, causing direct and proximate harm

to customers – the financial service providers (or direct purchasers), and ultimately to consumers – the end users (or indirect purchasers).

52. The anticompetitive actions of Defendant have directly injured Plaintiff in its business and property, as more fully described above and its injuries and damages are ongoing.

## PRAYER FOR RELIEF

**WHEREFORE**, based on the foregoing, Plaintiff BANXCORP respectfully requests that this Court:

a. Issue a declaratory judgment that Defendant has violated Section 1 of the Sherman Act, and the New Jersey Antitrust Act, N.J. Stat. Ann. § 56:9-1 *et seq*;

b. Grant injunctive relief, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and Section 56:9-10 of the New Jersey Antitrust Act, prohibiting Defendant and all persons, firms, and corporations acting on their behalf, or under their direction or control, from engaging in any further conduct unlawful under Section 1 of the Sherman Act, and under the New Jersey Antitrust Act;

c. Award Plaintiff damages in an amount to be proven at trial, to be trebled as provided by statute;

d. Award Plaintiff the costs of this action, including attorneys' fees; and

e. Grant any other relief as the Court deems just and proper.

Dated: Newark, New Jersey
       May 14, 2010

       Respectfully submitted,

*/s/ Nelson E. Canter*

Nelson E. Canter, Esq.
CANTER LAW FIRM P.C.
*Attorneys for Plaintiff*
123 Main Street – 9th Floor
White Plains, New York 10601
(914) 948-3011
ncanter@canterlawfirm.com